Filed 6/5/13  P. v. Madrigal CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ISCANDER FRANCISCO MADRIGAL,<br><br>  Defendant and Appellant. | F062969<br><br>(Super. Ct. No. 10CM8673)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County. Louis F. Bissig, Judge.[*]

Maribeth Halloran, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Retired judge of the Kings Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Defendant Iscander Francisco Madrigal was convicted of first degree murder (Pen. Code,[1] § 187, subd. (a)) following a seven-day jury trial.  The jury further found true the special allegations that the murder was committed to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)), and that defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (d), (e)(1)).  On appeal, defendant contends his right to confront and cross-examine witnesses was violated when the trial court allowed a gang expert to testify as to hearsay statements regarding contacts between defendant and other law enforcement officers.  In addition, he claims this same testimony violated his due process rights, and further argues that any failure to preserve these issues constituted ineffective assistance of counsel.  We find that any error in admitting the contested testimony was harmless beyond a reasonable doubt.  Further, we conclude defendant has not demonstrated his counsel was ineffective for failing to object to additional testimony.  Consequently, we affirm the judgment.

## FACTS

### Facts Relating to the Murder

On May 22, 2010, at approximately 11:00 p.m., Juan Zavala and his girlfriend Daniella Rizo went to the Circle K to purchase some medicine.  Zavala went into the store while Rizo waited outside in the parking lot in the driver's seat of her white Explorer, listening to the radio.  There was a white Mustang parked a few spaces over from the Explorer with three people inside.  While in the store, Zavala did not notice any problems between any of the customers.  Zavala exited the store without making a purchase and went to speak with Rizo in the parking lot.  He was about to go back into the store when he noticed some arguing between one of the men from the Mustang and someone from another car that was parked next to the Mustang.  Zavala wasn't paying much attention to the argument as he did not want to become involved.  He did notice that the man from the Mustang was standing on the passenger side of the car while the

---

[1]All further references are to the Penal Code unless otherwise indicated.

person he was arguing with was standing on the other side of the car. Zavala heard a shot and the man on the passenger side of the Mustang fell to the ground while the people in the other car sped off. The man, later identified as Luis Meza, died. Zavala had not seen any weapons.

Rizo testified that as Zavala was going back into the store, she heard a loud noise and then something hit her vehicle. She looked over and saw a man fall to the ground as a red car sped off. She also noticed that the back passenger's and driver's windows on her Explorer were now broken.

Victor Arellano was working the night shift at Circle K on the evening of the murder. He explained that he had parked his truck in a parking stall in front of the store. During his shift, a small red car parked in the stall to the right of his truck in front of the store. The white Mustang was in the stall to the right of the red car. Arellano had noticed a man exit the passenger side of the red car and enter the store. He identified this man as defendant. Defendant was wearing a white shirt with red sleeves.

Inside the store, defendant selected several items of candy and ultimately purchased a king-size Reese's candy bar. After making the purchase, defendant hurried out of the store while Arellano helped another customer. Arellano heard a loud pop coming from the parking lot, looked out, and saw two cars rapidly exiting the parking lot. One was a small red car, the other was a gray car that had been parked behind the red car and a white Mustang. He called 911 and went outside where he noticed the victim lying on the ground bleeding. The victim was on the passenger side of the white Mustang.

Arellano explained that the store had a video surveillance system, and two videos from the night of the murder were played for the jury. The first video was of the area near the register and depicted a number of customers inside the store. Arellano identified the victim entering the store wearing a black suit with white patches on the shoulders. He stated the victim had arrived in the white Mustang. While the victim was still inside the store, defendant arrived in the red car. Defendant entered the store while the victim was still inside. The victim left the store prior to defendant. Just after the victim left the

3.

store, a regular customer entered the store. The man was wearing a gray jacket. This was the man driving the gray car which was parked behind the white Mustang and the red car, blocking the Mustang and partially blocking the red car. While inside the store, defendant spoke to a man with sunglasses on his head, later identified as Christian Lopez. It appeared as if Lopez was waiting for defendant in the store. Defendant left the store after making his purchase. Arellano heard the loud pop shortly thereafter while he was helping the next customer.

The second video showed the inside of the store looking out into the parking lot. On the video, the white Mustang is parked in front of the store when the red car arrived and parked next to it. Defendant exited the passenger side of the red car and entered the store. Later, the victim left and the man driving the gray car parked behind the Mustang and the red car and entered the store. Shortly thereafter, defendant and Lopez left the store, and defendant appeared to enter the passenger side of the red car. When Arellano heard the pop, he looked up and saw the red car leave first, followed by the gray car.

Jennifer Machado, a Kings County Sheriff's Deputy, was dispatched to a call of shots fired at 11:38 p.m. She arrived at the Circle K within 20 to 30 seconds of the dispatch. Upon arrival, she noticed the victim with a gunshot wound to his chest, lying on his back next to the passenger side of the white Mustang. Although his eyes were open, he had no pulse and was not moving. She secured the scene and searched the area. She did not find any weapons at the scene or near the victim, however, she did not search any people at the scene. She noticed the white Explorer had a bullet hole in each of the two rear windows and the glass was broken.

Kings County Sheriff's Deputy Trevor Lopes responded to the murder, finding a slug in a home across the street from the Circle K. He assisted in preparing a crime scene diagram and noted the Explorer was separated from the white Mustang by one parking stall. Kings County Sheriff's Detective David Morrell found a nine-millimeter shell casing at the scene in the parking lot. This item was submitted for fingerprint analysis, however, no prints were found on the casing. Using a string through the two holes in the

4.

Explorer's windows, the detective attempted to trace the bullet's trajectory. He determined the trajectory was consistent with where the slug was found in the house across the street. He also searched the victim's body and found no weapons, however, he did not search any of the people at the scene.

Kings County Sheriff's Deputy Rachel Moroles assisted in the homicide investigation. On May 23, 2010, at approximately 6:30 a.m. she arrived at Lopez's home in Coalinga and found a red Honda. She found a king-size Reese's peanut butter candy wrapper on the passenger side floorboard of the car.

Coalinga police officer Amy Freeman testified that on May 10, 2010, she contacted Lopez regarding a possible burglary. During a search of his car, she found a loaded nine-millimeter gun magazine.

Kings County Sheriff's Deputy Chris Fernandes identified victim Meza. Meza had the moniker of "Camaron," meaning "Shrimp." Meza was later determined to be an active Sureno gang member.

Dr. Burr Hartman, a forensic pathologist, examined the victim's body and determined the cause of death was a gunshot wound to the chest that went through the heart and severed the left pulmonary artery, causing the victim to bleed to death. The bullet went through the victim's body entering just above the left nipple and exiting on the left side of his back. During the examination of the victim's body, Dr. Hartman noticed a "13" tattoo on the web of the thumb on the victim's right hand, as well as the words "Huron" and "South Side" on his back. According to a toxicology report, the victim had a large amount of methamphetamine in his system at the time of his death, indicating he had used within hours of his death.

Defendant and Lopez were both arrested at the home of Steven "Tank" Murrieta in Reedley on May 25, 2010.

**Testimony Regarding Defendant's Statements Following the Murder**

Two witnesses testified regarding statements defendant made to them shortly after the murder. The first witness was Julian Salinas, who at the time of trial was a dropout

5.

from the Norteno[2] street gang.  In August of 2010, after he was arrested on unrelated charges, Salinas stated he had information regarding a murder.  At trial, Salinas recounted a conversation he had with defendant and Lopez the morning after the murder.

At the time of the conversation, Salinas had known Lopez for approximately 10 years and had been close friends with him.  He also knew defendant, "because we right there in Coalinga, the northerners and everything, we hang around."  Lopez introduced defendant to Salinas.  Lopez had the moniker "Chino" and "C-Lo" and defendant's moniker was "Bam Bam."

On May 23, 2010, sometime between 7:00 and 8:00 a.m., Salinas received a telephone call from Lopez asking him to bring him some methamphetamine.  Shortly thereafter, "Grumpy" or "Grumps," a Norteno associate, arrived and picked up Salinas.  Salinas obtained the drugs and went to Grumps's apartment in Coalinga where he met defendant and Lopez.  Grumps's girlfriend was present at the home as well.  Both defendant and Lopez looked "spooked," and defendant told him that they had shot a "scrap."  "Scrap" is a derogatory term for a Sureno[3] gang member.  At first, Salinas did not believe them, but then saw their pictures on the television and heard the news story that they were wanted for a homicide.  Defendant told Salinas that while in the store, the victim started "tripping" on defendant and that the victim was going to call more people, so defendant just shot him.  There had been an argument between the victim and defendant over "gang stuff."  To the best of Salinas's knowledge, the argument was about the victim or one of his associates shooting Lopez's car approximately one week earlier.  In the gang culture, one would not report such an incident to police; rather, one would simply retaliate.  The appropriate level of retaliation would be to shoot up the house or to kill the person.

---

[2]The terms Norteno and northerner and north-sider were used interchangeably at trial. For ease of reference, we will simply use the term Norteno.

[3]The term Sureno was used interchangeably at trial with the terms southerner and south-sider.  For ease of reference, we will simply use the term Sureno.

Salinas testified that Lopez had showed him two guns, a .357 revolver and a nine-millimeter handgun and said they were going to get rid of them. In addition, Lopez and defendant had talked about burning their clothes and shoes and waiting for someone to pick them up to drive them out of town or out of state. They also explained that they had dropped off Lopez's red Honda at his mother's house in Coalinga.

Cesar Garcia was an active Varrio East Side Reedley Norteno gang member in 2010. He became a member of the gang at age 13 and used the moniker "Huero." In 2010, Garcia decided he wanted to leave the gang, and in doing so, he began working with law enforcement to help dismantle the gang. In May of 2010, Garcia received a telephone call from Tank, a fellow Norteno gang member, advising him there were two men at his home claiming to be Nortenos from Huron and stating they had murdered a Sureno. As Garcia was a high-ranking individual within the gang, he was tasked with investigating any newcomers to be sure they were not police infiltrators. Prior to going to Tank's home, Garcia activated a digital recording device and recorded his conversation with the two men.

At the house, Garcia met defendant, who introduced himself as Bam Bam, and another man who called himself Chris and also used the moniker Chino. There were approximately eight to 12 active Norteno gang members at the house at the time. The men explained that they had just murdered a Sureno at a gas station, that the murder was caught on camera, and that they were trying to leave the area. The murder had occurred one to two days prior to the conversation.

The tape of the conversation was played for the jury.

On the tape, defendant told Garcia that he was from Huron and that he had "murked a scrapa" and had been caught on camera committing the crime. Garcia explained that "murked" meant murdered. Defendant explained that while in the store,

> "that skrapa started tripping homie so were like fuck this nigga you know
> and when we were walking out this skrapa was still right there homie & he
> ficken called a grip of skraps homie & before that bro like two weeks
> before that he shot up all the car homie gacho like sprayed it homie no

windows nothing sprayed it bro so we were fuck these niggas as soon that [¶] … [¶] … as soon that fool tried to run up we were already inside the car I told this fool to turn around fool that fool tried to run up again ta ta pa that fool pa." (Capitalization omitted.)

Garcia explained that a "grip" means a lot, "gacho" means messed up and "sprayed" means shooting a lot of bullets. In addition, when defendant said that "when that fool tried to run up," it meant that the victim was trying to engage in battle with him. Defendant went on to say he only shot the victim once with a nine-millimeter while defendant was inside the vehicle. The incident began when the victim was "wolfing" or "talking shit" towards defendant. According to defendant, another car with approximately six people arrived just before the shooting. This would be consistent with someone calling in a "grip."

After the shooting, the duo dropped the car off at Lopez's mother's house and disposed of the gun and their clothes and shoes. Defendant admitted in the conversation that he was in gang files, meaning he was a validated gang member. Garcia gave the men clothes and shoes and allowed them to stay at Tank's house. He did so because as a gang member he was obligated to help out a fellow gang member avoid detection from the police.

Garcia explained that in the gang culture, if a Sureno shoots a Norteno's car, the Norteno is expected to retaliate by killing the Sureno. The goal is to kill rival gang members. This is what defendant was discussing with him in the conversation. Killing a Sureno would benefit the Norteno gang.

According to Garcia, being a gang member is a "life-style, it's like you're [*sic*] job …. You go put in work, meaning you go find a rival gang member and … you try to inflict violence towards them." "Putting in work" means committing an act of violence toward the rival gang. The whole purpose of the Norteno gang is to intimidate Surenos, to make them stop "banging" and to do violence upon them. Committing violence against the rival gang will get a gang member recognized. However, taking credit for

8.

someone else's crime is against the rules. The Nortenos are a very structured gang, providing a code of conduct by which its members must abide.

**Gang Evidence**

Officer Santiago Jurado worked with the Huron Police Department during 2010. Jurado has known defendant since 2005 or 2006 and has had numerous personal contacts with him both contacting and arresting him on several occasions. Based on his personal experience with defendant, Jurado testified that defendant was a member of the Norteno street gang in 2010 and uses the gang moniker Bam Bam. Gang members use a moniker or nickname in lieu of using their given name to conceal their identity from law enforcement. He further testified Lopez was a friend of defendant and was also a Norteno gang member. Jurado was also familiar with the victim Meza through several contacts and arrests for possessing an open container and being drunk in public. Meza was a Sureno gang member and had the moniker Camaron.

Fresno Police Department Detective Kyle Kramer is assigned to the Multi Agency Gang Enforcement Consortium task force. As part of his duties, he collects and documents information about gang members and their activities on field identification cards. Kramer is familiar with Cesar Garcia through his gang investigations. Garcia was an influential member of the Varrio East Side Reedley criminal street gang, a subset of the Norteno gang. During February of 2010, Kramer met with Garcia regarding Garcia's desire to leave the gang. Garcia expressed a willingness to become an informant and, in fact, worked as an informant from February until November of 2010, when he was placed in witness protection. Garcia received monetary compensation while working as an informant. In addition, arrangements were made to lift a parole hold on Garcia at one point.

Detective Kramer explained there are primarily three gangs in Huron, the Nortenos, the Surenos and the Bull Dogs. Huron Park Side as well as Varrio East Side are both subsets of the Norteno gang. Subsets are part of the larger gang except they tend

9.

to use variations on the gang name. However, they all use the same colors, numbers, and symbols of the gang.

Detective Charles Buhl with the Kings County Sheriff's Department testified as an expert regarding gangs and gang culture. He explained that the Norteno street gang, under the name Nuestra Familia, began in prison in the 1960's to protect themselves from the Surenos, known at the time as the Mexican Mafia. The Nortenos associate with the number 14, which represents "N," the fourteenth letter of the alphabet, and the color red. Common symbols used by the Nortenos are one dot followed by four dots to represent the number 14, or the Roman numeral "X" followed by the number 4 or four dots with two lines underneath also representing the Aztec number 14. The gang and its members also use a northern star as a symbol of the gang.

Gang membership is divided into three categories: the "wannabe" or distant admirer, the associate who "walks like it, talks like it, is willing to do crimes to be accepted," and the actual gang members who "walk like it, they talk like it, they have either been to prison, they got a lot of respect, they put in a lot of work, they've got the tattoos, they've got the moniker." "Putting in work" means committing crimes or going on missions for the gang. Gang members will "fly colors" or show the color of their gang as well as have prominent tattoos to announce their presence. Gang members get respect through spreading fear and intimidation. The more a person is feared, the more respect they have within the gang. As a result, those members are looked up to by other gang members and get certain benefits.

The primary activities of the Norteno street gang are murder, attempted murder, arson, vehicle theft, narcotics trafficking, robbery, burglary, driveby shootings, and felony assault. The Norteno and Sureno gangs are rivals. The gangs are always engaged in conflicts with each other. These conflicts usually escalate from minor fights to homicides. Gang members are always expected to retaliate against their rivals with escalating force, and the failure to do so is perceived as a weakness. Gang members will help other gang members with hiding places, even if they are from other counties.

10.

Detective Buhl reviewed the gang contacts and prior convictions of three Norteno gang members: Giovanni Miranda, Carlos Basulto, and Julio Enriquez. After reviewing and detailing their prior contacts, Buhl opined that each was an active Norteno gang member and had committed specific crimes for the benefit of that gang. The documents demonstrating the convictions for these three men were also admitted into evidence. Specifically, Buhl testified that in December of 2005, a school was broken into. Items were taken and gang graffiti was left behind. Miranda, Basulto, and defendant were identified as the perpetrators, with both defendant and Miranda admitting involvement in the break-in.

Detective Buhl opined that Lopez was a Norteno gang member based on some specific contacts Lopez had with law enforcement. Specifically, Lopez associated with other known gang members, chased rival gang members while yelling gang slurs, and burned a porch belonging to a rival gang member. In addition, he noted Lopez had gang-related tattoos.

Detective Buhl also reviewed reports and spoke to other law enforcement officers regarding defendant. He briefly recounted seven specific incidents that he considered gang contacts regarding defendant, which are described more fully below. He also reviewed photos of defendant depicting his tattoos. Buhl explained that defendant had numerous tattoos indicating his gang membership, including tattoos of one dot and four dots on his hands, a tattoo of a northern star on his calf, a tattoo of Huron Park Side on his forearm, "Norte" on his chest and tattoos of "X" and "4" on his arms. Huron Park Side is a subset of the Norteno gang. Based on this information, Buhl opined defendant was a member of the Norteno street gang.

After speaking with other officers and the family members of the victim as well as reviewing specific law enforcement contacts, Detective Buhl opined the victim was an active Sureno gang member. The victim's tattoos were also indicative of his Sureno gang membership. The Sureno gang is an extremely violent gang with the primary purpose of eradicating Nortenos.

11.

The detective opined that a Norteno who was wearing a red and white shirt, who was riding in a red car, who ran into a Sureno with whom he had a history in a parking lot of a minimart, and who shot the Sureno after exchanging looks and words, committed the shooting for the benefit of the Norteno gang. This act would benefit the gang by showing the strength of the Norteno gang and also by removing a rival gang member from the street. Committing the shooting while wearing red would advertise that the shooting was committed for the benefit of the gang. In addition, if the person later talked about "murking a scrap," it advertises the shooting was committed for the gang, and demonstrates knowledge the victim was a member of the rival gang. Committing the crime in the presence of another Norteno gang member further demonstrates the crime was to benefit the gang. Based on the facts he reviewed, the detective had no doubt about his opinion that the crime was committed for the benefit of the Norteno street gang.

**Defense Evidence**

Socorro Rebolledo was dating Jorge Marquez (Grumpy) in 2010. On May 23, 2010, she and Marquez visited a family member at a hospital. She denied ever seeing either defendant, Lopez or Salinas on that date, or meeting with the three at her apartment. She did not know if Marquez was a Norteno gang member. Marquez testified he visited his sister in the hospital on the evening of May 22, 2010. He was home all day the next day and no one came over to his home. He denied that defendant, Lopez and Salinas came to his apartment.

Kings County Sheriff's Deputy Robert Balderama testified he assisted in processing the red Honda recovered from Lopez's mother's home for gunshot residue. After collecting the kit, he provided it to the lead investigator.

The parties stipulated that a defense investigator attempted to serve a subpoena on Murrieta in Reedley but was unable to locate him.

12.

## I. Any Error in Admitting the Contested Testimony Was Harmless Beyond a Reasonable Doubt

At trial, "gang contacts" were referred to by a number. The issue of defendant's prior specific contacts with police was discussed three times. The first was during an in limine conference where defendant objected to gang contact numbers 5, 6, 8, 9 and 11 "under level hearsay."[4] The second discussion about defendant's gang contacts occurred during the initial direct examination of Detective Buhl. Defendant objected as the detective was recounting a specific gang contact regarding Giovanni Miranda, which ultimately was the same contact as contact number 5 involving defendant. During a sidebar, defendant clarified that the objection was on hearsay and *Crawford* (*Crawford v. Washington* (2004) 541 U.S. 36) grounds as to that particular contact. The final discussion regarding this testimony occurred immediately before Buhl resumed his testimony, at which time defendant objected specifically to three contacts involving defendant. After the court ruled the contacts were admissible, defendant lodged a hearsay objection on the record to each of the contacts during the testimony.

The contacts which were ultimately recounted to the jury were as follows.

Contact number 2 occurred on March 1, 2006, and involved defendant confronting his mother regarding her speaking to a rival gang member's mother about a bike theft. Defendant slapped his mother, wielded an aluminum bat at her, and left the home. There was never an objection to this testimony on the record.

Contact number 3 occurred on the same day. Defendant, with other Norteno gang members, was contacted by Huron police officers near fresh graffiti indicating Norteno association. Officers found an aluminum bat, spray paint, and beers nearby. There was no objection to this testimony.

---

[4]The prosecution ultimately did not produce evidence of contacts 8 and 9. Counsel went on to object to another contact, number 13, based specifically on its reliability and prejudice grounds. That contact also was never provided to the jury.

Contact number 5 occurred on July 26, 2006, and involved a report that defendant along with Giovanni Miranda and others assaulted a victim with rocks, bricks, and a bike peg. The victim was unsure of who actually hit him. The victim reported the attackers stated, "Hey, scraps, you want some problems" during the assault. The statement was uttered by Miranda, not defendant. Defendant objected to this testimony. This same contact was also recounted regarding Miranda's gang contacts.

Contact number 6 occurred on October 4, 2006, where Huron police officers responded to a vandalism report. The victim claimed defendant had thrown rocks at his vehicle. Defendant was later arrested and admitted to being a Norteno and to knowing the victim was a Sureno. The victim further reported the problem was over the rival gang association of the two. Defendant objected to this testimony.

Contact number 10 occurred on December 2, 2007, when Huron police officers responded to a complaint of a bike theft. The victims reported that defendant along with others stole a bicycle. During the ordeal, defendant reached for a bulge in his pocket, simulating that he had a firearm, and stated he would shoot them. When defendant was arrested, he admitted he was a Norteno gang member and that he took the bicycle. The victims had laughed at him and he wanted to intimidate them because he is a Norteno and the victims were Surenos. He also called the victims "bitch ass scraps." He admitted he liked using fear and intimidation to his advantage. There was no objection to this testimony.

Contact number 11 occurred on January 19, 2010, and involved a Huron police officer responding to a claim that a victim was assaulted with a two-by-four. The victim identified defendant as one of his attackers. According to the victim, defendant stated, "What do you bang, this is Norte?" He further stated "this is Bam Bam, I'll get you on the streets." Defendant objected to this testimony.

The final contact was contact number 12, occurring on January 24, 2010. According to a police report, defendant was a passenger in a vehicle stopped for a traffic violation. Officers noted defendant was wearing a red sweatshirt during the contact and

14.

there were some ski masks in the vehicle. Officers documented a number of defendant's tattoos with photographs. There was no objection to this testimony.

Initially, we find that defendant has failed to preserve any claim of error regarding contact numbers 2, 3, 10, and 12. Defendant never objected to any of these contacts, rather, counsel specifically limited her objections to the testimony as to contacts numbers 5, 6, and 11. Defendant contends trial counsel objected to "the gang contacts testimony of the gang expert" and specifically objected to "the admission of multi-layered hearsay contained in Officer Buhl's STEP Act Report of gang contacts concerning [defendant's] participation in gang criminal activity." However, the record does not support defendant's claim that he objected to each of the gang contacts. Rather, the record discloses defendant only objected to three contacts.

During trial, and prior to resuming Detective Buhl's testimony, defendant's counsel placed hearsay objections to some of the anticipated testimony on the record. After a discussion with the prosecutor regarding exactly which contacts were going to be used as a basis for Buhl's testimony, defendant's counsel specifically objected to only three of those contacts, numbers 5, 6, and 11. Indeed, counsel expressly noted she was not objecting to at least two of the other contacts.[5] Thus, it is clear that these were the only contacts complained of at the trial level. This conclusion is supported by the fact counsel only objected to these same contacts during the trial testimony. As defendant never objected at trial to the admission of the remainder of the testimony, he is precluded

---

[5]Counsel stated she had "no basis" to object to contact number 10 as that recounted defendant's own statements. Further, she noted no objection to number 12 except for any comment on deportation, which the prosecutor agreed not to discuss.

Defendant's counsel did object once during Detective Buhl's initial testimony when he was recounting prior gang contacts involving Giovanni Miranda. Counsel lodged a hearsay and *Crawford* objection when the detective was recounting the contact on July 26, 2006. This contact is the same as contact number 5 recounted above. Again, it is clear from the record that defendant's objection was limited to only that contact. Indeed, counsel explained that the "objection is that *this contact that the expert is describing* is at least double hearsay under the *Crawford* decision and under the decisions in *In Re Nathaniel C*., and in People versus Gardeley …." (Italics added.)

15.

from raising the objection for the first time on appeal.  (Evid. Code, § 353; *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [confrontation clause claim not preserved for appeal without timely and specific objection]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1118 [confrontation clause claim waived absent objection].)

As to the challenged testimony, defendant argues the admission of the testimony violated the confrontation clause.  He reasons that the hearsay statements consisted of testimonial statements offered for their truth without an opportunity to cross-examine the declarant in violation of *Crawford v. Washington*, *supra*, 541 U.S. 36.  Plaintiff argues the statements were not offered for their truth but, rather, were offered as a basis for the expert's opinion and therefore do not fall under the class of statements governed by *Crawford*.  Indeed, defendant recognizes his argument has been rejected in *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210, which held that an expert may rely on hearsay in forming the basis of an opinion and may relay that hearsay to the trier of fact in explaining the foundation for that opinion.  This holding has been consistently followed by the California appellate courts.  (*People v. Hill* (2011) 191 Cal.App.4th 1104 [following the rule in *Thomas* although disagreeing with its reasoning]; *People v. Sisneros* (2009) 174 Cal.App.4th 142; *People v. Ramirez* (2007) 153 Cal.App.4th 1422; *People v. Cooper* (2007) 148 Cal.App.4th 731; see *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 [experts may base their opinions "'on reliable hearsay, including out-of-court declarations of other persons,'" and may "'state on direct examination the reasons'" for their opinions].)

Defendant argues the recent United States Supreme Court opinion in *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] rejected the reasoning of *People v. Thomas*. In *Williams*, a four-justice plurality of the court found the admission of "[o]ut of court statements that are related by the expert solely for the purpose of explaining the assumption on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause."  (*Id*. at p. ___ [132 S.Ct. at p. 2228].)  In a concurring opinion, Justice Thomas found the statement at issue did not violate the

16.

confrontation clause as it lacked the requisite degree of solemnity and formality to be considered a testimonial statement, but rejected the plurality's reasoning that the statement was not offered for its truth. (*Id.* at p. ___ [132 S.Ct. at pp. 2255-2256] (conc. opn. of Thomas, J.).) In a dissenting opinion, four justices also rejected the plurality's reasoning that the statement was not admitted for its truth, and further found the statement was testimonial within the meaning of *Crawford*. (*Williams v. Illinois*, *supra*, at p. ___ [132 S.Ct. at pp. 2268, 2274.] (dis. opn. of Kagan, J.).) We need not determine whether the remaining three contacts that were properly preserved for appeal violated the confrontation clause as it is clear the admission of that testimony was harmless beyond a reasonable doubt.

It is well settled that confrontation clause violations are subject to the federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Geier* (2007) 41 Cal.4th 555, 608, overruled on other grounds in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) It is the People's burden under *Chapman* to prove beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*, *supra*, at p. 24.) "'Since *Chapman,* we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' (*Delaware v. Van Arsdall*[ (1986) 475 U.S. 673,] 681.) The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' (*Neder v. United States* (1999) 527 U.S. 1, 18.)" (*People v. Geier*, *supra*, at p. 608; cf. *People v. Harrison* (2005) 35 Cal.4th 208, 239 [admission of statements in violation of *Crawford* requires reversal unless it can be found beyond a reasonable doubt that "the jury verdict would have been the same absent any error"].) "To say that an error did not contribute to the verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.) We must undertake our

own review of the record and determine what impact the evidence had "on the minds of an average jury." (*Harrington v. California* (1969) 395 U.S. 250, 254.) In conducting a harmless error review, we must look to the record as a whole. (*United States v. Hasting* (1983) 461 U.S. 499, 509.) In applying this standard, we find that any error in admitting the contested statements was harmless beyond a reasonable doubt.

Our Supreme Court has recently applied the *Chapman* harmless error standard in light of a claimed *Crawford* violation in *People v. Rutterschmidt* (2012) 55 Cal.4th 650. There the defendant was charged with two counts of murder, conspiracy to commit murder, and the special circumstances of multiple murder and murder for financial gain. (*Id*. at p. 656.) One of the theories relied upon by the prosecution was that the defendant drugged one of the victims prior to the killing. (*Id*. at p. 652.) To prove this, the prosecution presented evidence of a laboratory director who testified that an analysis of the victim's blood, performed at the laboratory by another analyst, indicated the presence of certain drugs. (*Id*. at pp. 652-656.) The California Supreme Court found it did not need to address whether the testimony violated the confrontation clause of the Sixth Amendment as any error in admitting the testimony was harmless beyond a reasonable doubt. (*Id*. at p. 661.) The court cited the overwhelming nature of the evidence against the defendant in finding the exclusion of the evidence would not have affected the outcome of the trial beyond a reasonable doubt. (*Ibid*.) We find *Rutterschmidt* instructive.

The issues presented at trial were whether defendant was in fact the person who shot the victim, whether the shooting was committed in self-defense or in the heat of passion, whether the killing was premeditated, and whether the shooting was for the benefit of the gang. We will consider each of these issues in turn.

The testimony relating to the three prior gang contacts had no bearing on whether defendant was the person who shot the victim. There is no question defendant was at the store moments before the shooting as he is seen on video both inside the store making a purchase and outside of the store getting into the passenger side of the red car. That it

18.

was defendant who committed the shooting was evident from his recorded statements admitting to the murder. Defendant stated he "murked a scrapa" in his conversation with Garcia. He admitted he used a "nine" to commit the crime, which corresponded with the nine-millimeter shell casing found at the scene. In addition, he admitted the murder to Salinas the morning after the crime, and Salinas noted that defendant and Lopez had two guns—a .357 and a nine-millimeter—with them. None of the challenged evidence went to the fact that defendant was the shooter. Thus, there can be no doubt that the verdict was not affected by the challenged evidence on this point.

The three contacts that defendant objected to, which occurred long before any events in the present case, had nothing to do with whether the killing was premeditated, in self-defense, or in the heat of passion as they did not address defendant's specific relationship with this victim. Each of these contacts briefly[6] recounted an assault between defendant and a rival gang member where defendant uttered gang slurs. Almost identical information was relayed to the jury through contact number 10, where defendant admitted to stealing a rival gang member's bicycle, simulated a weapon, uttered gang slurs, and admitted using his gang status to spread fear and intimidation. There was no objection to this evidence. The jury also heard, without objection, that defendant was involved in and admitted to a break-in at a school with Miranda and Basulto. This break-in was also gang related. Further, defendant was found near fresh gang graffiti in another contact and was found wearing gang colors in yet another gang contact. Thus the testimony was merely cumulative of other evidence before the jury.

Furthermore, the evidence could have had no bearing on the issue of self-defense, heat of passion, or premeditation under the specific facts of this case. There was overwhelming, uncontradicted evidence of the long-standing rivalry between the Norteno and Sureno street gangs. Detective Buhl testified that the rivalry between the gangs

---

[6]The description of the three contacts to which defendant objects occupies approximately three pages of the 600 pages of testimony in this case.

19.

extended to the gangs' inception in the 1960's. Both Garcia and Buhl testified to the rivalry between the two and that each gang had the goal of eradicating the other. Even defendant pointed out this rivalry in making his claim of self-defense.[7] This rivalry, of course, provided a motive for the shooting in this case.

Moreover, it was quite clear at trial that there was a specific motive for the shooting. As both the prosecution and defense argued to the jury, the victim was perceived as being responsible for shooting at Lopez's mother's car shortly before the murder. This was a specific act of aggression by the victim, a Sureno gang member, against the Nortenos. It was this particular incident that was presented as both the basis of self-defense and the motive for the shooting. Defendant repeatedly brings up this prior incident in his taped conversation when discussing the murder.

In discussing their conversations with defendant, both Salinas and Garcia noted that the argument that preceded the shooting was not only gang related, but also related to the prior shooting of Lopez's mother's car. Garcia further explained that based on his conversation with defendant, the murder here was in retaliation for the prior shooting of Lopez's mother's car. Thus it is clear from the record any error in admitting cumulative nonspecific acts of gang violence could have had no impact on the findings of motive, premeditation, and self-defense or heat of passion by the jury.

Likewise, any error in admitting the evidence was also harmless beyond a reasonable doubt as to the special circumstance finding. First, we find overwhelming evidence that defendant was an active Norteno gang member and that the crime was committed for the benefit of the street gang. The record is replete with references to defendant's gang status, both from the witnesses and from defendant's own statements in the recorded conversation. Defendant admitted he was in gang files, he stated that he

---

[7]During closing argument, defense counsel argued as follows:

"And you've learned a lot about south-siders and Nortenos during this trial. South-siders, [the victim's] gang, is an extremely violent gang, the most prevalent gang in the United States of America and their mission is to completely eradicate northerners."

"murked a scrapa," and defendant was considered a fellow gang member by both Salinas and Garcia. Defendant sought out Garcia, a fellow gang member, for help in hiding from police even though he did not know Garcia. Garcia provided defendant with clothes and a place to stay because gang members are obligated to protect other members even if they do not know them or they are from other counties. Defendant had five gang-related tattoos, including two that announced the name of his gang. Defendant was wearing red, the color of his gang, at the time of the crime and was with another active Norteno gang member. Moreover, Officer Jurado testified without objection that defendant was a Norteno gang member based on his numerous personal contacts with him. As the evidence of his gang membership was overwhelming, the complained-of contacts could have had no effect on the verdict.

While Detective Buhl did use these contacts in providing his opinion that defendant was a gang member, these were not the only bases of his opinion. There were numerous other contacts, not objected to, which formed the basis of his opinion in addition to defendant's gang tattoos, his gang clothing, and the circumstances of the crime.

Defendant's primary contention regarding prejudice is that the evidence of the three objected-to gang contacts were used as a basis for finding defendant knew members of the gang participated in a pattern of criminal activity. However, a close examination of the record demonstrates any error was harmless. By all accounts the primary purpose of the gang is to engage in criminal activity. First, Detective Buhl testified the primary purpose of the gang is to commit crimes, specifically, murder, attempted murder, arson, vehicle theft, narcotics trafficking, robbery, burglary, driveby shootings, and felony assault. To become a member of the gang, one must "put in work" by committing crimes for the gang. The detective recounted numerous instances where others committed crimes for the gang. This was further supported by Garcia, a former high-ranking gang member himself, who explained that in gang culture one has to "put in work, meaning you go find a rival gang member and … you try to inflict violence towards them." In

21.

addition, he explained that the purpose of the gang is to do violence on the other gang. Indeed, the entire recorded conversation between defendant, Lopez and Garcia demonstrates the purpose of the gang is to commit crimes. Defendant repeatedly acknowledges his readiness to commit violence against rival gangs.

According to both Garcia and Detective Buhl, the gang is a very structured entity. Garcia testified that members have to abide by a code of conduct, and "if you want to be a northerner, … you will abide by our rules and regulations or else we'll get rid of you." Gang members are expected to respond to violence with greater violence. Garcia further explained that being a part of a gang is a life style choice that includes making money selling drugs, showing colors, having noticeable tattoos, and being involved in a life of crime. "Going to jail, coming out, in and out, getting shot, going to funerals …. [S]elling drugs…. [¶] … [¶] It's all for the gang." Garcia explained that members are indoctrinated that this is their cause and members have great pride in their gang. This sentiment was echoed in defendant's own words when he states:

> "All I know bro this time Im fuckin were they're at I pulled the trigger I told the homie the other homie I told that fool I'm sure homie don't trip this foo is going to get murked right homie fuck this nigga I was tired of these foos go to Avenal and we get poped hell each time these foo's aint fucking around with us.… [¶] Wrong with this bro. Im like if I let these motherfuckers run up again they're gonna fuck up our ride & fuck us I cant let that happen *I have heart homie*. Pah… [¶] … [¶] Pah…I told his homie too I murk that nigga I murk that nigga and sure enough find out later on the homie's all texting me hey the home boy passed away …." (Italics added, some capitalization omitted.)

Based on the evidence produced, it is inconceivable that one could conclude defendant was a member of the gang yet have no knowledge that its members "engage in or have engaged in a pattern of criminal gang activity." Defendant's closing argument contradicts such a finding. In attempting to argue it was not in fact defendant who committed the murder, counsel argued that he could have merely been boasting to Garcia to gain benefits within the gang and to "look tough. Tough to the head guy in Reedley." Such an argument demonstrates the strength of the evidence that defendant knew that

22.

members of the gang participate in a pattern of criminal activity. In addition, defendant's own words belie any argument that he did not know the gang members engaged in a pattern of criminal activity.

Defendant admitted to Garcia in the recorded conversation that he was in "gang files," which meant he was a validated gang member. He also admitted in his conversation that he had participated in gang activities previously. Defendant stated,

> "Im kool bro Im if anything I felt guitas about it's for the homie right here, *Ive been through shit like this already* (unaudible). [¶] … [¶] I, I never been through shit like to fuckin fuckin getting caught on camera that's another thing homie *Ive done dirt already* Ive been done shit like that fuck camera thing nuh uh thats why I (inaudible) I was like fuck Im fucked this time man. Its like I really dont think about, I dont want to think about (inaudible)." (Italics added, some capitalization omitted.)

In addition to the overwhelming evidence recounted above, we note that the jury deliberated for only an hour and 11 minutes before reaching its verdict, again indicating the strength of the evidence. Considering the record as a whole, it is clear that the complained-of testimony did not contribute in any meaningful way to the issue of guilt. We are confident that any error was harmless beyond a reasonable doubt in light of such overwhelming evidence at trial.[8] (See *People v. Rutterschmidt*, *supra*, 55 Cal.4th at p. 661.)

## II. Defendant Was Not Denied Effective Assistance of Counsel

Defendant claims his trial counsel's failure to object to the remaining gang contacts detailed by Detective Buhl constituted ineffective assistance of counsel. We disagree.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the

---

[8]Defendant goes on to argue that the admission of the evidence also violated his due process rights. As defendant acknowledges, however, he did not object to the testimony on due process grounds, thereby forfeiting the issue on appeal. (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1126, fn. 30.) Even if this court were to consider such a claim, we have already found that the admission of the evidence, even if in error, was harmless beyond a reasonable doubt.

assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To establish ineffective assistance of counsel, "'a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant….'" (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) Defense counsel's failure to object rarely establishes ineffective assistance of counsel. (*People v. Avena* (1996) 13 Cal.4th 394, 444-445.) "[W]hen the reasons for counsel's actions are not readily apparent in the record, we will not assume constitutionally inadequate representation and reverse a conviction unless the appellate record discloses '"no conceivable tactical purpose"' for counsel's act or omission." (*People v. Lewis*, *supra*, at pp. 674-675; accord, *People v. Ray* (1996) 13 Cal.4th 313, 349 ["In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission"].)

Here, counsel specifically objected to only three of the contacts presented by the prosecution. There was clearly a difference between the contacts defendant objected to and the ones where no objection was voiced. The common denominator between all the contacts to which trial counsel objected was that each relayed information from a victim of crime to a law enforcement officer. While such evidence certainly could have been admitted in a case such as this to prove the prior contacts with police, defense counsel objected to the hearsay nature of the statement, seeking a chance to cross-examine the victim as to the event. The other contacts to which counsel lodged no objection, however, contained either statements made to law enforcement by defendant himself, or personal observations by law enforcement as to defendant's conduct.[9] Counsel's

[9]The only exception is contact number 2, which related an incident where defendant slapped his mother because she spoke to the mother of a rival gang member. Given the relatively minor nature of this contact in comparison to the remainder of the contacts and the evidence in this case as a whole, as discussed above, it is not reasonably probable that defendant would have received a more favorable result at trial if this contact had been excluded. Further, defense counsel may have had a tactical reason for not forcing defendant's mother to testify against him at the trial.

understanding of this significant difference is reflected on the record when counsel expressly stated she had "no basis" to object to contact number 10, as that recounted defendant's own statements.

For example, in contact number 10, which occurred on December 2, 2007, defendant told arresting officers that he was a Norteno, that he had taken the victim's bicycle because he had laughed at defendant, defendant wanted to intimidate him due to his reputation as a Norteno, that he had called the victim a "bitch ass scrap," and defendant admitted he wanted to intimidate the victim, a Sureno. Certainly defendant's own statements were admissible against him as a party admission. (Evid. Code, § 1220.) As such, the statements are fully admissible for their truth. The same holds true for the remainder of the contacts as they recounted either admissions or personal observations of defendant's conduct.

A tactical reason not to object to the contacts is apparent. As counsel noted on the record, she was aware her client's statements were fully admissible against him. While defendant's counsel could have objected to the statements coming in through Detective Buhl instead of the officer who took the statement, counsel very likely may have forgone that step knowing that the prosecution would have in fact brought in the officer who took the statement. There is nothing on the record to indicate that any officers in this case were in any way unavailable. Rather, it is apparent that at least two officers who had had prior contacts with defendant and Lopez in fact testified in this case. By choosing to allow the statements to be admitted through Buhl instead of the officer who took the statement or who in fact made the personal observations, defendant's counsel called far less attention to the evidence. At trial, Buhl recounted each contact very briefly. Requiring the prosecution to call each officer who had each contact with defendant would have served only to highlight this testimony.

*People v. Montiel* (1993) 5 Cal.4th 877 is instructive. There, during the penalty phase of a murder trial, the prosecution introduced testimony from an expert regarding the defendant's mental state and intoxication. (*Id*. at p. 901.) During his testimony, the

expert revealed he had reviewed trial testimony of the defendant's cellmate, and he testified about accounts of the murder the defendant had provided to his cellmate. (*Id.* at pp. 920-921.) There was no objection to the testimony. (*Id.* at p. 918.) The California Supreme Court found counsel's failure to object to the hearsay testimony was not "facially incompetent." (*Id.* at p. 921.) As the court explained, counsel must have realized that an objection to the testimony would not have prevented its admission, as the prosecution would have either produced the cellmate or introduced his prior trial testimony if he was unavailable. (*Ibid.*) Either would have only stressed the testimony. Thus there was a valid tactical reason for not pursuing the objection.

Because a valid tactical reason exists for defense counsel's lack of objection, defendant's claim of ineffective assistance of counsel must fail. (*People v. Ray*, *supra*, 13 Cal.4th at p. 349.)

## DISPOSITION

The judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:


_____

WISEMAN, Acting P.J.


_____

POOCHIGIAN, J.

26.